PANTLIND HOTEL CO., AND PANTLIND BUILDING CO., PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 18436.  Promulgated December 27, 1927.

*Frank E. Seidman, C. P. A., Julius H. Amberg, Esq.*, and *Jacob S. Seidman, Esq.*, for the petitioners.

*John F. Greaney, Esq.*, for the respondent.

OPINION.

SIEFKIN: It is urged by petitioners that the two so-called "waivers" were improperly admitted in evidence on the ground that the Commissioner's signature was not properly identified and also on the ground that it was not shown by whom and when they were signed on the part of the Commissioner, and are thus inoperative as proof that the statute of limitations has been suspended. During

the hearing it was stipulated by the parties that such instruments were properly signed by officers of the companies and that the seals were the corporate seals. They were produced from the files of the Commissioner and introduced by counsel representing the Commissioner at the hearing of the case.

It is obvious from the instruments themselves that the Commissioner himself did not sign them since initials appear under the signatures which we assume are the initials of someone signing for him. Nor do the instruments, by themselves, show what date the signatures of " D. H. Blair " were placed thereon. Each contains, however, a typewritten date of November 3, 1925.

The term " waiver " is a misnomer and is misleading. Congress in neither the Revenue Act of 1924 nor 1926 used the word as designating an instrument which extended the time for determination, assessment and collection by the taxing officials, but instead, in section 278 (c) of both Acts, spoke of a case " where both the Commissioner and the taxpayer have consented in writing." This language recognized a bilateral agreement. A contract may be unilateral in obligation, but always has at least two operating parties; a waiver " so far as it is thought to be anything, * * * is unilateral." Ewart, Waiver Distributed, 150.

These instruments, then, create an obligation contractual in its nature and admitted by petitioners to be signed by their proper officers, regular on their face and produced on behalf of the other party.

Sections 322 and 323 of the Revised Statutes, section 1301 (a) of the Revenue Act of 1918 and section 1 of the Urgent Deficiency Appropriation Act, approved October 6, 1917 (40 Stat. 348), provide for the appointment of deputy commissioners and an assistant to the Commissioner. The statutes referred to provided that the deputy commissioner " shall act as Commissioner of Internal Revenue in case of the absence of that officer." Like duties are prescribed for the assistant to the Commissioner. Section 1 of the Act of October 6, 1917, provides in part as follows (40 Stat. 348) :

The Commissioner of Internal Revenue is authorized to assign to Deputy Commissioners such duties as he may prescribe, and the Secretary of the Treasury may designate any one of them to act as Commissioner of Internal Revenue during the Commissioner's absence.

Nothing appears in the record of this appeal to indicate that the signature or approval of the Commissioner was not made in accordance with the provisions of the statutes referred to.

Furthermore, there is a well recognized rule that, at least in many instances, discretionary acts of executive officers may be performed

by subordinates. In *Railway Company* v. *United States*, 244 U. S. 351, it appeared that a temporary Forest Reserve had been created by the order of the Commissioner of the General Land Office. The order was made under the direction of the Secretary of the Interior. The acts under which the order was issued bestowed upon the President of the United States the power to withdraw lands from disposition under the public land laws. In the course of the opinion (page 357) the court states that "the act of the Secretary of the Interior in directing the latter (the withdrawal) was in legal contemplation the act of the President." See also *Wilcox* v. *Jackson*, 13 Pet. 498, 513.

Also the mere fact that the words " D. H. Blair, Commissioner," appearing on the waivers submitted in evidence was not in the personal handwriting of D. H. Blair does not constitute evidence tending to prove that the signature did not represent his personal discretionary act. In *Bartlett* v. *Drake*, 100 Mass. 174; 97 Am. Dec. 92, it was held that a person who appears before a magistrate and duly acknowledges the execution of a deed to which his name was subscribed by another in his absence, thereby recognizes and adopts the signature as his own. See also 22 L. R. A. 297; and 8 R. C. L., p. 938. There is nothing to show that the signature appearing on the waivers introduced in evidence was not written at the personal direction of D. H. Blair or that it was not adopted by him as his own after having been written by another. In *Commonwealth* v. *Slifer*, 25 Pa. St. 23; 64 Am. Dec. 680, 683, it was stated that the acts of public officers should be construed with liberality. " There is always a presumption that they (acts of public officers) are in accordance with the law. The presumption can be repelled only by clear evidence of illegality."

In *Hartwell* v. *Root*, 19 Johns. (N. Y.) 345, it appeared that a deputy sheriff had an execution returnable in February. In March the debtor sold certain horses which he owned on the return day. Afterwards the deputy sheriff sold the horses under the execution. Held in the absence of proof, that it would be presumed that the property was levied upon before the return day. See also section 579 of Mechem on Public Officers.

It would appear that the approval or consent of the Commissioner to the waivers involved in this appeal is clearly not within the rule of such cases as *Lyons* v. *Alley*, 130 U. S. 177; *Clark* v. *Corporation*, 12 Wheat 40; and *Lord* v. *City* (Wis.) 2 N. W. 785, where it was held that specific acts of municipal officers could not be delegated under the statutes governing the matter. Under the circumstances, we have no hesitation in holding that petitioner is bound by the terms of such instruments and that the deficiencies in question, having been asserted within the time as agreed upon, are not barred. *Trustees for Ohio & Big Sandy Coal Co., et al.*, 9 B. T. A. 617.

As to the question of affiliation, the hotel company owned at least 98 per cent of the common stock of the building company during the taxable year and were such ownership the sole criterion there would be no doubt of the affirmative application of the Revenue Act for a consolidated return. However, in addition to the common stock there was outstanding during the year preferred stock of the building company and this preferred stock was possessed of voting rights due to the provision of the law of the State of Michigan that preferred stock was entitled to full voting rights where, as here, the issuing corporation was in arrears more than 60 days in the payment of dividends on the preferred stock. There were outstanding 3,989 shares of common stock and 4,453 shares of preferred stock of the building company, or an aggregate of 8,442 shares, all of which had full voting rights during 1921. Accordingly, it becomes necessary to analyze the holdings of the preferred stock. Set out in the findings of fact is an analysis of the holdings of the voting stock of both companies as at the beginning and at the end of the year. In grouping the holdings of stockholders common to both companies, minor variations in comparative percentages owned in each company are disregarded, in accordance with the *Appeal of Rowe Transfer & Coal Co.*, 1 B. T. A. 593. The combined holdings of the hotel company and of the stockholders common to both companies amounted in the aggregate to about 83 per cent of the total outstanding voting stock of the building company at the beginning of the year, and about 85 per cent thereof at the end of the year. The record is silent as to the identities and the extent of the separate holdings of most of the stockholders included in the statement in the group designated " all others," leaving it open to conjecture whether the shares thus designated represented in their aggregate the true measure of the minority interest. We do know, however, that such minority was about 17 per cent of the outstanding stock at the beginning of the year and 15 per cent at the end of the year. As pointed out in *Appeal of Isse Koch & Co.*, 1 B. T. A. 624, the word " control " as used in the statute means " to exercise a direct, a restraining or directing influence over; to dominate; hence to hold from action; to curb; subject; overpower." And the question is one of actual or practical control as contrasted with ownership or legal control. In *Benjamin Electric Manufacturing Co.*, 6 B. T. A. 1204, 1210, we said:

Affiliation, if it exists, must be based on ownership or control of substantially all the stock. *Appeal of Tunnel Railroad of St. Louis,* 4 B. T. A. 596. The control required by the statute is control of the voting stock, and this control must be shown to be genuine, and must be actually exercised. *Appeal of Isse Koch & Co.,* 1 B. T. A. 624. Control of the business with a quiescent minority is not sufficient, nor is the fact that there is unity of purpose and harmonious cooperation sufficient to satisfy the statutory requisites for affilia-

tion. *Rishell Phonograph Co.*, 2 B. T. A. 229. *Tunnel Railroad of St. Louis, supra.* We have also said, in the *Appeal of Cleveland & Mahoning Valley Railway Co.*, 4 B. T. A. 1040, that it will be noted that the words "controls" and "controlled" as used in section 240 (b) of the Revenue Act of 1918 are not in any manner limited or qualified. In the absence of any qualification these words must be taken to mean full and complete control.

In that case we denied affiliation although the minority stockholders worked with the principal stockholders "toward a harmonious end" and although the two corporations "worked together as a business unit," basing such denial upon our view that control of the business is not control of the stock. In this case, however, ownership of about 54 per cent of the voting stock of the building company by the hotel company is to be considered in connection with the ownership of an additional 29 to 31 per cent of the building company by stockholders of the hotel company.

Upon a careful consideration of all the evidence, including the evidence as to intercompany transactions set forth in our findings, we are of the opinion that substantially all of the voting stock of petitioners was controlled by the same interests and the taxes should be determined upon the basis of a consolidated return.

Reviewed by the Board.

> *Judgment will be entered on 15 days' notice, under Rule 50.*