ESTATE OF HENRY MILLER, DECEASED, GEORGE MANDELBAUM, EXECUTOR, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 87180, 87181, 87186.   Filed June 17, 1964.

*Robert S. Raum*, for the petitioner.

*Michael D. Weinberg*, for the respondent.

PIERCE, *Judge:* In docket No. 87180, respondent determined transferee liability against the decedent, Henry Miller, in the amount of $137,949.75, in respect of income taxes of Goldmark Coat Co., Inc., for its taxable fiscal years ended on the last day of February 1952 through 1956. Following the death of Henry Miller, his estate was substituted as the petitioner herein. Thereafter respondent, by amendment to his answer at the trial herein, made claim to an increased transferee liability in the aggregate amount of $152,348.58, together with interest thereon as provided by law.

In docket Nos. 87181 and 87186, respondent determined deficiencies in the income taxes of decedent, for calendar years and in amounts as follows:

| Docket No. | Year | Deficiency |
|---|---|---|
| 87181 | 1952 | $14,668.62 |
|  | 1953 | 14,030.29 |
|  | 1954 | 7,831.14 |
| 87186 | 1955 | 7,887.79 |
|  | 1956 | 4,265.97 |

Here again, following the death of Henry Miller, his estate was substituted as the petitioner herein.

The three foregoing cases, together with the cases of Goldmark Coat Co., Inc. (docket No. 87182), Emanuel Marks and Ray Marks (docket No. 87185), and Emanuel Marks, Transferee (docket No. 87187), were consolidated for trial. Thereafter, following the trial the cases at docket Nos. 87182, 87185, and 87187, were settled by the parties thereto in February 1964.

The issues presented for decision are:

■ Whether the executor of the petitioner-estate, the legal representative of the decedent, Henry Miller, is liable as a transferee of Goldmark Coat Co., Inc., for that corporation's income taxes; and, if so, the amount of such transferee liability.

■ Whether petitioner's decedent was entitled to:

(a) Deductions for contributions, interest expense, and travel and entertainment expenses for his taxable year 1952;

(b) Deductions for travel and entertainment expenses and dependency exemptions for 1955; and (c) deductions for travel and entertainment expenses and alimony in 1956—all in excess of the amounts which the respondent allowed as deductions in respect of said items.

■ Whether certain distributions which the decedent received from the Goldmark Coat Co. in each of the calendar years 1953 through 1956, constituted gross income to him for the respective years in which the same were received.

■ Whether for each of the years 1952 and 1953, the decedent omitted from the gross income reported on his return, an amount properly includable therein which was in excess of 25 percent of the amount of gross income stated in the return, so the assessment and collection for said years are not barred by the statute of limitations.

Medical expense deductions were partially disallowed for each of the decedent's taxable years 1952 through 1955 because of the mathematical limitations imposed by section 23(x) of the 1939 Code and by section 213 of the 1954 Code. Additional medical expense deductions, if any, allowable for said years will be determined under Rule 50.

### FINDINGS OF FACT

Petitioner is the estate of Henry Miller, deceased. Miller died on June 14, 1962, and on August 9, 1962, the Surrogate's Court of New York County, N.Y., granted letters testamentary to George Mandelbaum, the executor named in the decedent's last will and testament. Hereinafter, the term "petitioner" will be used in referring to said estate; and the name "Miller" will be used in referring to Henry Miller, when he was still alive.

Miller filed joint income tax returns with his then wife, Jeraslava Miller, for each of the calendar years 1952, 1953, and 1954, with the

district director of internal revenue at Brooklyn, N.Y. He filed separate returns for each of the years 1955 and 1956, with the same official. Jeraslava Miller did not join in filing the petition in docket No. 87181, relating to the years when joint returns were filed.

Goldmark Coat Co., Inc. (hereinafter sometimes called Goldmark), was incorporated under the laws of the State of New York on April 1, 1947, for the purpose of manufacturing and selling popular priced ladies' coats and suits at wholesale. It kept its books of account and filed its Federal income tax returns on an accrual basis of accounting and for fiscal years ending on the last day of February.

On May 13, 1949, Miller and an individual named Emanuel Marks (hereinafter called Marks) became, and thereafter remained, equal 50-percent shareholders of Goldmark. During all periods here involved, Miller was the treasurer of Goldmark, and Marks was its president.

Throughout the period extending from Goldmark's fiscal year ended February 28, 1950, through its final taxable period, Miller followed a practice of having the company's bookkeeper draw certain checks payable to cash. After these checks had been taken to the bank by the bookkeeper or one of the company's other employees, the proceeds were generally turned over directly to Miller. Thereafter the bookkeeper, acting in accordance with Miller's directions would put portions of said cash in envelopes in amounts designated by Miller, and place the envelopes in the company safe; or in some instances, she would simply put the loose cash in said safe. Miller and the bookkeeper were the only ones who had the combination to the safe. On Miller's instructions, cash in the safe would be turned over to him by the bookkeeper; and at times Miller took cash from the safe without saying anything to the bookkeeper. None of these funds was retained by or returned to the Goldmark corporation.

Miller instructed the bookkeeper to charge the amount of the checks to various expense accounts of the company. The amounts of cash proceeds derived from said checks, and the accounts of Goldmark to which such withdrawals were charged for each of the fiscal years ended February 28, 1950, through 1956, and for the period March 1 through December 31, 1956, were as follows:

| Year or period ended | Travel and entertaining | Selling expense | Sundry expense | Commissions | Total |
|---|---|---|---|---|---|
| Feb. 28, 1950 | $40,902.80 | $23,078.00 | $8,650 | $5,658.49 | $78,289.29 |
| Feb. 28, 1951 | 26,150.00 | 18,546.43 | 9,042 | 1,600.00 | 55,338.43 |
| Feb. 29, 1952 | 26,500.00 | 15,741.50 | 10,355 | 6,070.00 | 58,666.50 |
| Feb. 28, 1953 | 28,836.00 | 14,882.89 | 13,800 | None | 57,518.89 |
| Feb. 28, 1954 | 34,650.00 | 1,290.00 | 14,800 | None | 50,740.00 |
| Feb. 28, 1955 | 34,009.00 | 5,270.00 | 8,850 | 2,716.63 | 50,845.63 |
| Feb. 29, 1956 | 33,460.00 | 9,400.00 | 7,810 | 11,154.46 | 61,824.46 |
| Dec. 31, 1956 | 15,937.73 | None | 3,335 | None | 19,272.73 |
| | 240,445.53 | 88,208.82 | 76,642 | 27,199.58 | 432,495.93 |

The foregoing amounts were deducted by Goldmark on its tax returns. The Commissioner upon audit of the company's returns disallowed aproximately 75 percent of such amounts as deductions. The company filed a petition in this Court, alleging such disallowance to be in error (docket No. 87182) ; and in the above-mentioned settlement in Goldmark's case, an additional 15 percent of the above amounts was allowed as a deduction. In the case at docket No. 87182, Goldmark's income tax liabilities were settled in the following amounts:

| Taxable year ended Feb. 28 or 29: | Tax liability |
|---|---|
| 1950 | $18, 927. 96 |
| 1951 | 10, 083. 27 |
| 1952 | 18, 171. 49 |
| 1953 | 26, 235. 71 |
| 1954 | 18, 797. 86 |
| 1955 | 14, 180. 70 |
| 1956 | 4, 068. 03 |
| | 110, 465. 02 |

Of the amounts of cash which Miller withdrew from Goldmark in the manner above described, Miller kept and used for his own purposes the following amounts during the periods indicated:

| Fiscal year ended Feb. 28 or 29: | Amount |
|---|---|
| 1952 | $34, 965. 02 |
| 1953 | 34, 497. 17 |
| 1954 | 30, 439. 00 |
| 1955 | 30, 598. 16 |
| 1956 | 37, 076. 41 |
| Period Dec. 1–Dec. 31, 1956 | 11, 559. 09 |
| | 179, 134. 85 |

None of the foregoing amounts was included in gross income on Miller's returns.

Goldmark paid the cost of garaging Miller's automobile during the years in issue as follows:

| Fiscal year ended Feb. 28 or 29: | Amount |
|---|---|
| 1952 | $778. 44 |
| 1953 | 979. 68 |
| 1954 | 1, 151. 25 |
| 1955 | 725. 55 |
| 1956 | 604. 71 |
| Period Mar. 1–Dec. 31, 1956 | 259. 21 |
| Total | 4, 498. 84 |

In May 1954, Goldmark purchased a Jaguar automobile, which was used exclusively by Miller, at a cost of $3,651.35. Depreciation on said car was deducted by Goldmark during the years in issue, as follows:

| Fiscal year ended Feb. 28 or 29: | Amount |
|---|---|
| 1955 | $760.70 |
| 1956 | 912.84 |
| Period Mar. 1–Dec. 31, 1956 | 456.42 |
| Total | 2,129.96 |

Said amounts of depreciation reflect, in the circumstances here present, the fair value of the benefit to Miller for use of said car.

Miller dressed expensively and had a luxurious way of life. In 1953 or 1954, one of Goldmark's employees on two occasions delivered an envelope containing money to Jessica Miller, Miller's then former wife, which deliveries were made on Miller's instructions. The same employee on one occasion paid hospital bills of Jeraslava Miller, Miller's then wife. During 1955 and 1956, Miller simultaneously maintained a suburban home and two New York City apartments. In 1954 or 1955, Miller arranged and paid for an airplane to transport two of Goldmark's employees and himself to Fire Island, N.Y., for a vacation. In 1954, 1955, and 1956, Miller took vacations in Florida to which he traveled by train. Miller had an arrangement whereby he drove his car into the station and alongside the railroad car which, after boarding, was like his own private car. Miller took five or six 2- to 3-week vacations in Florida during 1953 through 1956, and, in addition, took weekend vacations in Florida. During the years in issue, Miller operated a Cadillac and also the company's Jaguar. Miller regularly dined in expensive restaurants.

At all times from and after March 1, 1951, the liabilities of Goldmark exceeded its assets by substantial amounts.

By December 31, 1956, Goldmark discontinued operations, although it has never been formally dissolved. Since January 1957, it has been entirely without assets.

As of February 28, 1950, Goldmark had no accumulated earnings and profits. Current earnings and profits of Goldmark are to be increased (or decreased) by the excess of premiums paid on policies of life insurance on its officers, over the cash surrender values of such policies, as follows:

| Fiscal year ended Feb. 28 or 29: | Amount |
|---|---|
| 1952 | $137.50 |
| 1953 | (1,262.50) |
| 1954 | (3,262.50) |
| 1955 | (1,275.50) |
| 1956 | (2,210.09) |
| Period Mar. 1–Dec. 31, 1956 | 3,725.49 |

The amounts of gross income reported by Miller on his 1952 and 1953 returns were as follows:

| | |
|---|---|
| 1952 | $27,800 |
| 1953 | 29,250 |

The respondent originally determined transferee liability against Miller on March 16, 1960, in respect of Goldmark's taxes for its fiscal years ended February 29, 1952, through 1956, in the aggregate amount of $137,949.75, plus interest as provided by law. At the trial, respondent by amendment to his answer, increased the aggregate amount of said transferee liability to $152,348.58, together with interest thereon as provided by law. As a result of the settlement effected by the parties in Goldmark's case, docket No. 87182, that corporation's tax liabilities have been fixed at an aggregate lesser amount of $81,453.79 for its fiscal years 1952 through 1956. Respondent now concedes that the last-mentioned amount, together with interest thereon as provided by law, is the upper limit of the transferee liability in docket No. 87180, in respect of Goldmark's tax liabilities.

With regard to the deficiencies determined against Miller in respect of his own tax liabilities (docket Nos. 87181 and 87186), the following schedule shows with respect to the deductions partially and wholly disallowed by the respondent, the amounts claimed by Miller on his returns, the portions thereof disallowed by the respondent, and the amounts determined to be allowable as deductions:

| Years | Amount claimed on returns | Disallowed by respondent | Amount determined to be allowable |
|---|---|---|---|
| *1952* | | | |
| Contributions | $1,375.00 | $1,375 | |
| Interest expense | 1,154.22 | 530 | $624.22 |
| Travel and entertainment | 2,210.00 | 2,210 | |
| *1955* | | | |
| Travel and entertainment | 1,250.00 | 1,250 | |
| Dependency exemptions | 1,800.00 | 1,800 | |
| *1956* | | | |
| Travel and entertainment | 1,150.00 | 1,150 | |
| Alimony | 8,565.00 | 2,190 | 6,375.00 |

Respondent determined that the amounts hereinabove described which Miller withdrew from Goldmark and used for his own purposes, constituted taxable dividends to Miller to the extent of the company's earnings and profits, and capital gains to the extent said amounts exceeded earnings and profits.

## OPINION

1. *Re Transferee Liability.*—The Supreme Court has held that whether one who has received money or property from another can be held liable for the payment of that other party's unpaid tax liabilities, depends upon the law of the State where the transfers took place. *Commissioner* v. *Stern*, 327 U.S. 39. In the instant case, since the transfers which formed the basis for the assertion of transferee liability against Miller (and ultimately against the executor as his legal representative—Miller having died between the issuance of the notice

of transferee liability and the trial herein) occurred in the State of New York, we look to the law of that State for guidance. The pertinent New York statute, N.Y. Debt. & Cred. sec. 273, provides as follows:

Sec. 273.   Conveyances by insolvent—

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

If there are here found to have been fraudulent conveyances or transfers by Goldmark to Miller, then the U.S. Government as one of Goldmark's creditors, can properly proceed against the estate of Miller, the transferee, to collect its debt for Goldmark's taxes, utilizing the expeditious remedy of transferee proceedings provided by the internal revenue laws of the United States.   See and compare in this connection *Phillips* v. *Commissioner*, 283 U.S. 589.

We look first to see if there were fraudulent transfers from Goldmark to Miller.   We think that the proceeds of the above-mentioned checks drawn by Miller, none of which was retained by or returned to Goldmark and all of which came to rest in Miller's hands, were transfers of money to Miller.   The estate's defense is that Miller retained none of such money, but rather expended all of it for company purposes, in making gifts to buyers and the like.   Despite the fact that not a single recipient was identified, the respondent has agreed that approximately 40 percent of those cash amounts are allowable as deductions; and the inference from respondent's adjustment is that to this extent Miller must be regarded as having expended the cash for the company's benefit.   As regards the remaining 60 percent, the respondent having established that Miller received the money, the burden lay upon the estate to prove that the money was expended for company uses, rather than for Miller's personal benefit.   *Fada Gobins*, 18 T.C. 1159, affd. 217 F. 2d 952 (C.A. 9).   The petitioner-estate has failed to carry that burden.

The elements of insolvency of the Goldmark company and lack of consideration delivered by Miller to said company have been established.   Our findings of fact are explicit that Goldmark was insolvent (i.e., its liabilities exceeded its assets) at all times after March 1, 1951; and all of the transfers on which the asserted transferee liability is predicated, occurred after that date.   Also the record contains no evidence of any consideration passing from Miller to Goldmark in respect of the transfers, nor is there any claim or assertion by the petitioner-estate that he furnished any consideration.

Respondent must establish either that he attempted to collect the tax liabilities due from the transferor, or that such attempts would have been meaningless and futile.   Clearly, in the instant case, at-

tempts to collect from Goldmark would have been futile, since it has been admitted by petitioner that Goldmark has been insolvent since March 1, 1951, and has had no assets whatever since January 1957—both of which dates are prior to the issuance of the notice of transferee liability on March 16, 1960.

We hold that Miller received by transfer from Goldmark, without consideration and while that company was insolvent, cash which he did not expend for the company's benefit but kept and used for his own personal purposes, in the aggregate amount of $179,134.85. We further hold that his estate is liable for Goldmark's unpaid income taxes for its fiscal years ended February 29, 1952, through February 29, 1956, in the aggregate amount of $81,453.79, together with interest thereon as provided by law.

2 and 3. *Re Miller's Individual Income Tax Liabilities.*—First considering the partially and the wholly disallowed deductions for travel and entertainment, interest expense, contributions, and dependency exemptions, we find that there is no evidence which would tend to indicate that the respondent's adjustments are erroneous. Petitioner-estate had the burden of establishing error in the respondent's determinations; and it has not sustained that burden. We therefore sustain the respondent's disallowance of the above deductions.

With respect to the partially disallowed alimony, the record shows only that Miller claimed a deduction for $8,565 in his 1956 return, and that the respondent disallowed $2,190 of that amount, with the explanation that "the sum of $2,190.00 does not qualify as a proper alimony deduction under any provision of the Internal Revenue Code of 1954."

On brief the petitioner-estate takes the position that the disallowance by the respondent was due to a determination on his part that a portion of the alimony payment was for the support of Miller's children; and that such allocation was based upon a construction of the terms of the divorce decree, such as was disapproved by the Supreme Court in *Commissioner* v. *Lester*, 366 U.S. 299. The difficulty is that there is no evidence to support such contention. The notice of deficiency does not reveal the reason for the disallowance. There is no copy of the divorce decree of record. There is not even evidence that the amount in dispute was paid. In these circumstances, we are impelled to sustain the respondent's partial disallowance of the alimony deduction.

We turn now to the respondent's determination that Miller had received certain cash distributions from Goldmark that were includable in his personal income; and that he also received other benefits from the said corporation, in the form of having Goldmark pay the cost of garaging his car, and in the form of having said corporation furnish him with the use of a car. We hold that the amounts of said

cash distributions and the value of said additional benefits constituted gross income to Miller for the respective years in which the same were received by him. *Healy* v. *Commissioner*, 345 U.S. 278; *Bennett E. Meyers*, 21 T.C. 331, 346–347; and *Estate of Henry E. Mills*, 4 T.C. 820, 827. If and when any of the same is applied in satisfaction of Miller's liability as transferee of Goldmark, then an appropriate adjustment will be allowable in computing the tax for the year in which satisfaction of the transferee liability is effected. *Healy* v. *Commissioner*, *supra;* G.C.M. 16720, XV–1 C.B. 179.

4. *Re Statute of Limitations.*—The question here is whether Miller omitted from the gross income reported in his return for each of the years 1952 and 1953, an amount in excess of 25 percent of the gross income stated in the return. If he did, then the assessment and collection of the deficiencies for said years are not barred by the statute of limitations. Sec. 275 (c). The findings of fact make it clear that the amounts of Miller's unreported cash withdrawals and benefits from Goldmark in said years (which were taxable to him), are in excess of 25 percent of the gross income shown on his returns for said years. It follows that assessment and collection for said years are not barred by limitations.

*Decisions will be entered under Rule 50.*